**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| CELLULAR COMMUNICATIONS EQUIPMENT LLC,<br><br>　　　　Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., et al.,<br><br>　　　　Defendants. | Civil Action No. 6:14-cv-759-KNM |

**<u>DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................1

II.    LEGAL AUTHORITY ........................................................................................1

     A.     Construction of Means-Plus-Function Terms ..........................................2

     B.     Construction of "Nonce" Terms ...............................................................3

     C.     Indefiniteness ...........................................................................................4

III.   PREVIOUSLY CONSTRUED TERMS AND PHRASES ...................................5

IV.   DISPUTED TERMS AND PHRASES THAT REQUIRE CONSTRUCTION.....5

     A.     U.S. Patent No. 8,254,872.........................................................................5

           1.     Means-Plus-Function Terms .........................................................6

                    (a)     Claim 12 is Indefinite for Failure to Identify Structure Clearly Linked to the Recited Claimed Functions ..........................8

                    (b)     The Disclosed Terminal is a General Purpose Computer..............10

                    (c)     Knowledge of One of Ordinary Skill in the Art Cannot Supplant the Absence of Structure................................................12

           2.     Additional '872 Patent Terms Invoke §112, ¶6 Under *Williamson*...........14

                    (a)     "Receiver," "Comparator," and "Connection Unit" Invoke §112, ¶6...............................................................................................15

                    (b)     "Receiver," "Comparator," and "Connection Unit" Are Indefinite ....................................................................................17

     B.     U.S. Patent No. 8,645,786.........................................................................17

           1.     "self-decodable"...........................................................................18

           2.     "self-decodable redundancy version" ..........................................20

           3.     "self-decodable rate matching patterns" .....................................21

                    (a)     "Self Decodable Rate Matching Pattern" Is A Nonsensical Term And The Intrinsic Evidence Renders Its Scope Unclear..............................................................................................22

                    (b)     CCE's Multiple Constructions Further Demonstrate This Term's Indefiniteness................................................................24

     C.     U.S. Patent No. 8,055,820.........................................................................25

           1.     "monitor[ing] a usage of a plurality of buffers" .........................25

           2.     "network device" .........................................................................28

                    (a)     "network device" is a means-plus-function limitation..................29

                    (b)     "network device" is indefinite .....................................................30

D.    U.S. Patent No. 7,218,923 ..................................................................................... 30

    1.    "controlling entity" .............................................................................. 31

        (a)    "controlling entity" is a mean-plus-function limitation ................. 31

        (b)    "controlling entity" is indefinite ..................................................... 32

V.    CONCLUSION ............................................................................................................. 33

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Alappat*,
   33 F.3d 1526 (Fed. Cir. 1994)..................................................................................................10

*AllVoice Computing PLC v. Nuance Communications, Inc.*,
   504 F.3d 1236 (Fed. Cir. 2007)...............................................................................................13

*Application of Cohn*,
   438 F.2d 989, 58 C.C.P.A. 996 (Ct. Cust. & Pat. App. 1971) ................................................23

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008)..............................................................................1, 11, 12, 13

*Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*,
   222 F. Supp. 2d 423 (S.D.N.Y. 2002)......................................................................................23

*Atmel Corp. v. Info. Storage Devices, Inc.*,
   198 F.3d 1374 (Fed. Cir. 1999).............................................................................................4, 5

*Augme Techs., Inc. v. Yahoo! Inc.*,
   755 F.3d 1326 (Fed. Cir. 2014).....................................................................................3, 4, 33

*Acacia Media Techs. Corp. v. New Destiny Internet Group*,
   2004 U.S. Dist. LEXIS 13415 (C.D. Cal. July 12, 2004) .......................................................22

*B. Braun Med., Inc., v. Abbott Lab. and NP Med., Inc.*,
   124 F.3d 1419 (Fed. Cir. 1997).................................................................................................2

*Biomedino, LLC v. Waters Techs. Corp.*,
   490 F.3d 946 (Fed. Cir. 2007).............................................................................................5, 13

*Blackboard, Inc. v. Desire2Learn Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009).....................................................................................3, 4, 9, 11

*C4Cast.com, Inc. v. Dell, Inc.*,
   2013 WL 3379261 (E.D. Tex. July 3, 2013) ...................................................................11, 12

*CCE v. HTC et. al.*,
   Case No. 6:13-cv-507 (Dkts. 363, 413) ..............................................................................1, 5

*Cephalon, Inc. v. Abraxis Bioscience, LLC*,
   2015 WL 3756870 (Fed. Cir. June 17, 2015) .......................................................................27

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004)...............................................................................................23

*Ex Parte Craig S. Gittleman*,
  2008 WL 696137 (Bd. Pat. App. & Interf. 2009) ...................................................23

*Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*,
  412 F.3d 1291 (Fed. Cir. 2005).......................................................................... passim

*Disa Indus. A/S v. Thyssenkrupp Waupaca, Inc.*,
  2009 U.S. Dist. LEXIS 29873 (E.D. Wis. Apr. 7, 2009).......................................23

*EON Corp. IP Holdings LLC v. AT&T Mobility LLC*,
  785 F.3d 616 (Fed. Cir. 2015).......................................................................... 3, 13

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009).................................................................................19

*Function Media, LLC v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013)..........................................................2, 5, 12, 13

*Intel Corp. v. VIA Techs., Inc*
  319 F.3d 1357 (Fed. Cir. 2003).................................................................................13

*Harris Corp. v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005)...................................................................................1

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,
  302 F.3d 1352 (Fed. Cir. 2002).................................................................................18

*In re Katz Interactive Call Processing Patent Lit.*,
  639 F.3d 1303 (Fed. Cir. 2011)...................................................................................8

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
  382 F.3d 1354 (Fed. Cir. 2004).................................................................................17

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
  355 F.3d 1361 (Fed. Cir. 2004)...................................................................................2

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
  579 F.3d 1363 (Fed. Cir. 2009).................................................................................18

*Mass. Inst. of Tech. v. Abacus Software*,
  462 F.3d 1344, 1354 (Fed. Cir. 2006).................................................................4, 16

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003)...................................................................................3

*Medtronic, Inc. v. Advance Cardiovascular Sys., Inc.*,
  248 F.3d 1303 (Fed. Cir. 2001).............................................................................2, 8

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005).................................................................................27

*Mobile Telcoms. Techs., LLC v. LG Elecs. Mobilecomm USA, Inc.*,
  2015 WL 2250418 (E.D. Tex. May 12, 2015).......................................................10

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
 134 S. Ct. 2120 (2014) ..............................................................................4, 21

*Network Commerce, Inc. v. Microsoft Corp.*,
 422 F.3d 1353 (Fed. Cir. 2005) ...........................................................................24

*Noah Sys., Inc. v. Intuit Inc.*,
 675 F.3d 1302 (Fed. Cir. 2012) .............................................................................4

*O2 Micro Int'l. Ltd. v. Beyond Innovation Tech. Co., et al.*,
 521 F.3d 1351 (Fed. Cir. 2008) ...........................................................................26

*Omega Eng'g, Inc. v. Raytek Corp.*,
 334 F.3d 1314 (Fed. Cir. 2003) ...........................................................................13

*Optimize Tech. Solutions, LLC v. Staples, Inc.*,
 2013 WL 6170624 (E.D. Tex. Nov. 20, 2013) ...............................................11, 12

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ........................................................................2, 19

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
 378 F.3d 1396 (Fed. Cir. 2004) ...........................................................................27

*Robert Bosch, LLC v. Snap-On Inc.*,
 769 F.3d 1094 (Fed. Cir. 2014) .............................................................................8

*Sinorgchem Co. v. ITC*,
 511 F.3d 1132 (Fed. Cir. 2007) ...........................................................................18

*TDM Am., LLC v. United States*
 85 Fed. Cl. 774 (2009) ...................................................................................27, 28

*Tech. Licensing Corp. v. Videotek, Inc.*,
 545 F.3d 1316 (Fed. Cir. 2008) .............................................................................4

*Triton Tech of Texas, LLC v. Nintendo of Am., Inc.*,
 753 F.3d 1375 (Fed. Cir. 2014) .............................................................................4

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
 659 F.3d 1376 (Fed. Cir. 2011) ...........................................................................13

*Vitronics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed. Cir. 1996) ...............................................................................2

*WMS Gaming, Inc. v. International Gaming Technology*,
 184 F.3d 1339 (Fed Cir. 1999) ...........................................................................10

*Williamson v. Citrix Online, LLC*,
 770 F.3d 1371 (Fed. Cir. 2014) ...........................................................................16

*Williamson v. Citrix Online, LLC*,
 792 F.3d 1339 (Fed. Cir. 2015) .................................................................... passim

**<u>Statutes</u>**

35 U.S.C. §112.................................................................................................................. passim

35 U.S.C. §112(b) ...................................................................................................................4

35 U.S.C. §112(6) ............................................................................................................28, 31

## **TABLE OF EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Declaration of J. Stevenson Kenney, Ph.D. Regarding Claim Construction |
| Exhibit 2 | Excerpts of the '872 File History |
| Exhibit 3 | Excerpts of the '786 File History |
| Exhibit 4 | Dictionary definitions for the term "usage" – Part 1 |
| Exhibit 5 | Dictionary definitions for the term "usage" – Part 2 |

## I.    INTRODUCTION

Plaintiff CCE, an entity owned by Acacia Research, asserts five patents acquired from Nokia Siemens Networks.  These patents are subject to seminal claim construction cases issued by the Federal Circuit, including *Aristocrat* (2008), *Blackboard* (2009), *Noah* (2012), *Function Media* (2013), *Augme Technologies* (2014), and *EON Corp.* (2015).  According to these cases, patents claiming software functions in means-plus-function claims must disclose the specific algorithms for performing the claimed functions.  *See Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("[T]he corresponding structure for a §112 ¶6 claim for a computer-implemented function is the algorithm disclosed in the specification.") (citing *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005)).

Most recently, the Federal Circuit changed the landscape for means-plus-function claim terms, reversing its precedent creating a "strong" presumption against applying §112, ¶6 to certain "nonce" terms, such as "module," "device," and "unit for," that provide no more structure than "means."[1]  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).  This standard, along with the Supreme Court's *Nautilus* decision, ensures innovation is not impeded by vague or purely functional claims.  CCE's patents fail to meet this standard:  they claim software functions without disclosing the requisite structure or algorithms clearly linked to perform those functions and fail to inform one skilled in the art of the scope of the claims.  Accordingly, Defendants[2] submit their Responsive Claim Construction Brief.[3]

## II.    LEGAL AUTHORITY

"It is well-settled that, in interpreting an asserted claim, the court should look first to the

---

[1]    *Williamson* was decided after this Court's Claim Construction Orders in *CCE v. HTC et. al.*, Case No. 6:13-cv-507 (Dkts. 363, 413).

[2]    This brief is filed on behalf of Samsung Electronics, Co. Ltd, Samsung Electronics America, Inc., AT&T Mobility LLC, Cellco Partnership d/b/a Verizon Wireless, Sprint Solutions, Inc., Sprint Spectrum L.P., Boost Mobile, LLC, T-Mobile USA, Inc., and T-Mobile US, Inc. (collectively "Defendants").  Each Defendant joins the brief only with respect to the claims asserted against that Defendant.

[3]    For an overview of relevant technology described in the asserted patents, Defendants invite the Court to review their Technology Tutorial submitted on October 23, 2015.

intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004). "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). "The specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (quoting *Vitronics*, 90 F.3d at 1582).

### A.    Construction of Means-Plus-Function Terms

"Means-plus-function" claims are subject to 35 U.S.C. §112, ¶6, which requires that the specification "contain sufficient descriptive text by which a person of skill in the field of the invention would know and understand what structure corresponds to the means." *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1317 (Fed. Cir. 2013) (citations omitted). Construing means-plus-function claims is a two-step process, first determining the particular "function of the [claim] limitation" and next determining the "corresponding structure described in the specification and equivalents thereof." *Medtronic, Inc. v. Advance Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).

The Federal Circuit has instructed that "[s]tructure disclosed in the specification is 'corresponding' structure *only* if the specification or prosecution history *clearly links or associates* that structure to the function recited in the claim." *Id.* (emphases added) (quoting *B. Braun Med., Inc., v. Abbott Lab. and NP Med., Inc.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing §112, ¶6.")). Even if the specification discloses a structure that a person of skill would understand *could* be used to perform the recited function, that is not enough; the specification still must fully disclose and "clearly link" that structure to the performance of the function. *Id.* at 1311-13.

Additionally, corresponding structure "must include all structure that *actually performs*

the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (emphases added).  The identified structure needs to be more than a "black box." *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1382-83 (Fed. Cir. 2009). The structure needs to be described in detail and not as an abstraction.  *See id*.  Computer-implemented means-plus-function limitations, moreover, "must disclose an algorithm for performing the claimed-function," in order to meet the definiteness requirements of 35 U.S.C. §112, ¶2. *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1337 (Fed. Cir. 2014).

In determining whether an algorithm must be disclosed, it is irrelevant whether the specification enables a person of ordinary skill in the art to implement the claimed software function.  *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623-24 (Fed. Cir. 2015).   Such a focus would conflate the enablement requirement of §112, ¶1 with the definiteness requirement of §112, ¶2.  *Blackboard*, 574 F.3d at 1385.  If the patent claims a particular computer-implemented software function, the specification must disclose an algorithm for implementing it.  *EON Corp.*, 785 F.3d at 623-24.  Thus, the law requires a *quid pro quo*:  a patentee may claim generic means elements in purely functional terms only if the specification clearly discloses corresponding structure for performing that function.  *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003).

## B.      Construction of "Nonce" Terms

Terms that lack the words "means for" can still be means-plus-function terms that invoke §112, ¶6, especially now under the Federal Circuit's new standard.  There is no longer a "strong presumption" that §112, ¶6 does not apply in the absence of the word "means."  Rather, "[t]he standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson,* 792 F.3d at 1349.

The Federal Circuit in *Williamson* also provided guidance on the types of "nonce" terms that might invoke §112, ¶6.  The Court found the term "module" is a "well-known nonce word that can operate as a substitute for 'means' in the context of §112, ¶6" because the term "is simply a generic description for software or hardware that performs a specified function."

*Williamson*, 792 F.3d at 1350.  Like "module," other "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke §112, ¶6."  *Id.* (quoting *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006)).

### C.     Indefiniteness

Terms subject to §112, ¶6 must satisfy the definiteness requirements of §112, ¶2,[4] which mandate that the specification "particularly point out and distinctly claim" the subject matter of the invention."  *Blackboard*, 574 F.3d at 1382; *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014) ("[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.").[5]  Whether a means-plus-function limitation is invalid for indefiniteness is a matter of law.  *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).

A means-plus-function claim is indefinite "if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim."  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012) (citations omitted).  To determine indefiniteness of a means-plus-function term, the inquiry "asks first whether structure *is* described in [the] specification, and, if so, whether one skilled in the art would identify the structure from that description."  *Default Proof*, 412 F.3d at 1301 (quoting *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999)).  Importantly,

---

[4]   35 U.S.C. §112, ¶2 is now §112(b).

[5]   The Supreme Court's decision in *Nautilus* has not vitiated Federal Circuit precedent regarding determinations of indefiniteness for means-plus-function claims.  *See e.g., Augme Techs.*, 755 at 1338 (affirming summary judgment of indefiniteness because "[s]imply disclosing a black box that performs the recited function is not a sufficient explanation"); *Triton Tech of Texas, LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1380 (Fed. Cir. 2014) (affirming indefiniteness determination because of failure to disclose an algorithm for performing the function).  Both the standard in *Nautilus* and Federal Circuit precedent regarding indefiniteness of means-plus-function claims are based on the viewpoint of a person of ordinary skill in the art.

the requirements of §112, ¶6 cannot be satisfied when there is "a total omission of structure . . . . There must be structure in the specification." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 952 (Fed. Cir. 2007) (quoting *Atmel*, 198 F.3d at 1382). Accordingly, "the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification." *Default Proof*, 412 F.3d at 1302; *see also Function Media*, 708 F.3d at 1318.

## III.   PREVIOUSLY CONSTRUED TERMS AND PHRASES

CCE asserted three patents, U.S. Patent Nos. 8,055,820, 7,218,923, and 7,941,174, in a previous case before this Court:   *CCE v. HTC Corp. et al.*, Case No. 6:13-cv-507.   Since this Court has previously construed certain terms and phrases in these three patents, the Parties have agreed that for these disputed terms in this litigation, the Court's prior constructions of those terms will govern, but Defendants reserve the right to appeal these constructions.   *See CCE v. HTC Corp. et al.*, Case No. 6:13-cv-507 (Dkts. 363 and 413).   The Parties' respective proposed constructions and supporting intrinsic and extrinsic evidence for each of these terms are set forth in the their Joint Claim Construction and Pre-Hearing Statement.   (Dkt. 107.)   Defendants reserve the right to rely on portions of the prior claim construction record to appeal the construction of one or more of the previously-construed terms.

On November 2, 2015, the Court granted-in-part and denied-in-part Defendants' letter brief request to brief indefiniteness of certain terms, granting Defendants request to all terms except "designating unit" in the '820 patent.   (Dkt. 135.)   Defendants preserve their right to raise indefiniteness of "designating unit" on appeal for the same reasons the defendants set forth in the previous case and also for the reasons set forth in Defendants' letter brief.   (Dkt. 112, 128.)

## IV.   DISPUTED TERMS AND PHRASES THAT REQUIRE CONSTRUCTION

### A.      U.S. Patent No. 8,254,872

The '872 patent is directed to simplifying the IMS registration in the event a terminal makes an emergency call while in a visiting network.   The '872 patent discloses setting up an emergency call connection from a terminal to an IMS domain visited by the terminal.   (Dkt. 76-5 ['872 patent] at Abstract.)   If the terminal is already registered in the IMS domain and the

network identifier for the visited network and the home network are the same, the terminal dispenses with the IMS registration for the emergency-call connection. (*Id.*)  Figure 1, the only figure in the '872 specification, illustrates this IMS registration process. (*Id*. at Fig. 1.)

To describe the claimed invention, the specification merely discloses generic functions that a terminal must perform.  The '872 specification, which spans only two columns, however, is completely devoid of any discussion regarding *how* the terminal can perform those functions, their corresponding structure, or statements linking the functions to any structure.  The '872 patent merely sets forth that a "terminal" should perform each of these functions.

The '872 patent's prosecution history sheds light on the failure to disclose any physical structure or accompanying algorithm.  The '872 patent purports to claim priority to German App. 2006 019719 (Apr. 27, 2006).  ('872 patent at Foreign Application Priority Data; Ex. 2 ['872 Patent File History] at 1-3.)  In an effort to preserve its claim of priority, the patentee submitted an English translation of the German application as the specification for the '872 patent.  ('872 Patent File History at 14-18, 24, 31-37.)  However, this German priority application was directed to method claims, ***not*** apparatus claims.  (*Id.* at 38-40.)  The patentee also canceled all of the method claims that were originally in the German application and replaced those claims with the instant means-plus-function limitations of claim 12 and functional elements of claim 13, without attempting any corresponding amendments to the specification (which would not have been allowed at that stage of prosecution and would have defeated the patentee's priority claim).  (*Id.* at 4-13.)  As a result, the '872 patent claims issued without any corresponding structure in the specification to support the claimed functional elements of the patented claims.

### 1.      Means-Plus-Function Terms

| Term | CCE's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "receiving means for receiving a network identifier of a visited network notified to the terminal when | Function: receiving a network identifier of a visited network notified to the terminal when the terminal is registered in the visited network. | Indefinite.<br><br>This is a means-plus-function element to be construed in accordance with 35 U.S.C. §112, |

| | | |
|---|---|---|
| the terminal is registered in the visited network" (claim 12) | Structure: a mobile terminal (and equivalents).  *See* 1:18-26, 2:12-56, 3:19-42, Fig. 1.<br><br>Alternatively, should the Court determine an algorithm is required, the structure is:  a mobile terminal (1:18-26, 2:12-56, 3:19-42, Fig. 1) configured to perform one or more of the algorithms set forth in the '872 patent at 2:14-33, 2:40-44, 3:19-29, and Fig. 1 (and equivalents). | ¶6.<br>Function:  receiving a network identifier of a visited network notified to the terminal when the terminal is registered in the visited network.<br><br>Structure:  no corresponding structure disclosed. |
| "comparison means for comparing the received network identifier of the visited network with a network identifier of a home network of the terminal" (claim 12) | Function:  comparing the received network identifier of the visited network with a network identifier of a home network of the terminal.<br><br>Structure:  a mobile terminal (and equivalents).  *See* 2:21-39, 2:40-56, 3:30-42, Fig. 1.<br><br>Alternatively, should the Court determine an algorithm is required, the structure is:  a mobile terminal (1:24, 2:15, 2:21, 2:42, 3:19, Fig. 1) configured to perform one or more of the algorithms set forth in the '872 patent at 2:15-33, 2:40-49, 3:30-38, Fig. 1(and equivalents). | Indefinite.<br>This is a means-plus-function element to be construed in accordance with 35 U.S.C. §112, ¶6.<br><br>Function:  comparing the received network identifier of the visited network with a network identifier of a home network of the terminal.<br><br>Structure:  no corresponding structure disclosed. |
| "connection means for setting up an emergency call connection" (claim 12) | Function: setting up the emergency call connection.<br><br>Structure:  a mobile terminal (and equivalents).  *See* 1:18-26, 2:12-56, 3:19-42, Fig. 1.<br><br>Alternatively, should the Court determine an algorithm is required, the structure is:  a mobile terminal (1:24, 2:15, 2:21, 2:42, 3:19, Fig. 1) configured to perform one or more of the algorithms set forth in the '872 patent at 2:49-52, 3:39-41, Fig. 1(and equivalents). | Indefinite.<br>This is a means-plus-function element to be construed in accordance with 35 U.S.C. §112, ¶6.<br><br>Function:  setting up the emergency call connection.<br><br>Structure:  no corresponding structure disclosed. |

The parties agree that the three terms identified above are means-plus-function terms that are governed by 35 U.S.C. §112, ¶6.  The parties also agree on the corresponding function for all three terms.  The parties dispute only whether the '872 specification discloses any corresponding structure that is clearly linked to the recited claimed functions.  A reading of the '872 patent's

two-column specification makes clear that there is no such disclosed structure.

### (a)     Claim 12 is Indefinite for Failure to Identify Structure Clearly Linked to the Recited Claimed Functions

The Federal Circuit has consistently held and recently confirmed that when a patent's "specification fails to identify corresponding structures that are required where §112, ¶6 applies," its means-plus-function claims are indefinite.  *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1098 (Fed. Cir. 2014).  Claim 12 of the '872 patent is indefinite because its specification fails to "link" or "associate" structure for performing any of the functions of claim 12's means-plus-function elements:  "receiving means," "comparison means," or "connection means."  *See Medtronic*, 248 F.3d at 1312 (finding no "corresponding" structure where there was no "clear link or association between the[] structures and the [recited] function").

Instead of identifying structure linked to the functions of the means-plus-function elements, CCE simply argues that the "terminal" is the structure for these terms.  (Dkt. 131 at 12-13.)  CCE's argument is not surprising, because the '872 patent does not disclose *anything* other than a generic "terminal," forcing CCE to point to this terminal to try to save its claims.  A terminal, however, is a "generic and nondescript" term that includes a variety of functions and must be specially programmed to perform certain functions.  (*See* Ex. 1 [Kenney Decl.] ¶ 51.)  There is no disclosure (and CCE has failed to point to any disclosure) of what structure *within* the terminal performs the functions of each means-plus-function term.  (*Id*. at ¶¶ 49, 50, 54, 57.)  If the structure is a "terminal," it could be so broad as to cover a computer workstation.  (*Id*. at ¶ 51.)  Unfortunately for CCE, a generic terminal, within which another undisclosed structure is necessarily used to perform the claimed functions, is not sufficient.  *See Default Proof*, 412 F.3d at 1298 (corresponding structure "must include all structure that *actually performs* the recited function") (emphases added); *see also In re Katz Interactive Call Processing Patent Lit.*, 639 F.3d 1303, 1315, 1317 n.12 (Fed. Cir. 2011) (affirming that disclosure of a "terminal" without a defined interior structure was insufficient to satisfy §112, ¶2).

Specifically, there is no identification of what structures within the terminal (i) receive

the network identifiers, (ii) compare the network identifiers, or (iii) set up the emergency call connection.  (*See* Ex. 1 [Kenney Decl.] ¶¶ 49, 50, 54, 57.)  These functions must be performed by some specific structure—a "black box" is not a sufficient disclosure.  *See Blackboard*, 574 F.3d at 1382-83 (affirming indefiniteness where the specification disclosed a "black box that performs a recited function . . . by some undefined component of the system").

Although CCE relies on portions of the specification that recite a terminal performing a function (Dkt. 131 at 12-13, 16-17, 19) but these citations are devoid of any structure or algorithm in the "terminal" that is required to perform these functions.  For example, CCE does not even point to different evidence of structure for the different means-plus-function terms.  For all three terms, CCE points to Figure 1 and the portion of the '872 specification that describes Figure 1.  (Dkt. 131 at 12-13, 16-17, 19.)  Figure 1 does not teach **what** or **how** within the terminal it (i) receives the network identifiers, (ii) compares the network identifiers, or (iii) sets up the emergency call connection.  Instead, Figure 1 merely shows the communication between the terminal and the various network domain entities when an emergency call is initiated on the terminal.  Figure 1 is demonstrative of the "black box" problem, because it does not describe any structure within the terminal, but instead identifies the terminal as a generic box:



('872 patent at Fig. 1 (the yellow annotation denotes the "terminal" and blue annotations denote the network domain entities).)  Therefore, these three terms are indefinite because of this failure

9

to properly "link" any corresponding structure to the claimed function.  *Default Proof*, 412 F.3d at 1299 ("To meet the definiteness requirement, structure disclosed in the specification must be clearly linked to . . . the function claimed.").

**(b)**      **The Disclosed Terminal is a General Purpose Computer**

CCE argues that an algorithm is not required because the patent discloses a "special-purpose terminal."  (Dkt. 131 at 14, 17-19.)  CCE points to no disclosure in the specification that demonstrates that the terminal is in fact a "special-purpose" terminal—because there is nothing to point to.  (Dkt. 131 at 14, 17-19.)  Instead, CCE points to *Mobile Telcoms* to support the erroneous position that no disclosure of any algorithm is required.  However, *Mobile Telcoms* found structure that was more than a general-purpose computer, so no algorithm was required.  In *Mobile Telcoms*, the specification disclosed "[t]he *receiver 1506* is connected to a *display and storage logic section 1508* . . . A *display 1514*, preferably an LC display, is also connected to the display and storage logic 1508 to display messages and various other information to the user."  *Mobile Telcoms. Techs., LLC v. LG Elecs. Mobilecomm USA, Inc.*, No. 2:13-cv-947, 2015 WL 2250418 at *17 (E.D. Tex. May 12, 2015).  Based on this disclosure, the court stated that "the 'receiver 1506,' 'display and storage logic section 1508,' and 'display 1514' are disclosed as structures 'clearly linked or associated with the claimed function.'"  *Id.*  Here, there is nothing more disclosed than a terminal, unlike in *Mobile Telcoms*, which specifically set forth the internal structures within the computer for performing the claimed function.  Therefore, the disclosed "terminal" cannot be special purpose.

Furthermore, *WMS Gaming*, a Federal Circuit case that even CCE cites, correctly states the law on this point:  a means-plus-function claim with a software function must disclose a "special purpose computer ***programmed to perform the disclosed algorithm***."  *WMS Gaming, Inc. v. International Gaming Technology*, 184 F.3d 1339, 1349 (Fed Cir. 1999) (emphasis added).  The fact that a computer is special purpose is precisely because it is programmed to perform a certain algorithm.  *In re Alappat*, 33 F.3d 1526, 1545 (Fed. Cir. 1994) (cited by *WMS Gaming*).  Without the algorithm, the computer cannot be considered "special purpose."  *See id.*

10

The portions of the '872 patent specification to which CCE cites do not disclose the **structure** of the terminal, but instead disclose the terminal's functions.  (*See* Dkt. 131 at 12-13, 16-17, 19.)  But the functionality of the terminal is not a description of structure—it is simply an abstraction that describes the claimed functional elements, which are performed by some undefined component of the system.  *See Blackboard*, 574 F.3d at 1383 (holding that the term "access control manager" is simply an abstract term that describes the function of controlling access, which is performed by undefined components).  This is the quintessential definition of a general purpose computer.  *See id.* This was addressed head-on by the Federal Circuit in *Aristocrat*.  There, the Federal Circuit considered the question of whether a general reference to a "standard microprocessor-based gaming machine with appropriate programming" constituted a sufficient disclosure of structure to support a claimed function in a means-plus-function claim. *Aristocrat*, 521 F.3d 1328, 1331-33.  The Federal Circuit concluded that it did not.  *Id.* at 1338.

As the Federal Circuit explained:  "[t]he point of the requirement that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming."  *Id.* at 1333.  The Federal Circuit noted that "any general purpose computer must be programmed" and pointed out that relying on such general structure is equivalent to saying "that the function is performed by a computer that is capable of performing the function."  *Id.* at 1334.  The Federal Circuit also considered and rejected the very argument that CCE puts forth here—that language describing when the computer would perform the function at issue constituted a sufficient description of the structure for performing the function.  *Id.*  Such language "describes an outcome, not a means for achieving that outcome."  *Id.*

The cases CCE cites to support its position that an algorithm is not required are inapplicable here.  (Dkt. 131 at 14-15.)  For example, in both *C4Cast.com* and *Optimize Tech. Solutions*, on which CCE relies, the functions at issue were far less complex.  In *C4Cast.com*, the function merely required "maintaining a collection of resources,"  *C4Cast.com, Inc. v. Dell, Inc.*, 2013 WL 3379261, at *17 (E.D. Tex. July 3, 2013), a far cry from "receiving a network

identifier of a visited network notified to the terminal when the terminal is registered in the visited network."  While the former function is easily encapsulated by "storing a collection of resources" in a disclosed structure, i.e., a general database, *id.* at *18, 20, the claim component at issue here cannot be defined simply by "receiving a network identifier" at a terminal.  Rather, the network identifier is only received from a visited network and only when the terminal has been registered by that visited network.  Such limitations, requiring algorithmic explanation, were not present in *C4Cast.com*.  *See id.* at *17.  Similarly, the function at issue in *Optimize Tech. Solutions*—"storing the data file for at least one visitor"—can be defined by the functional language of storing the data file, unlike the claimed functionality in this case.  *Optimize Tech. Solutions, LLC v. Staples, Inc.,* 2013 WL 6170624, at *42 (E.D. Tex. Nov. 20, 2013).

Since there is nothing in the '872 specification that makes the disclosed "terminal" anything but a general purpose computer for performing the claimed functions, CCE must demonstrate that the '872 patent discloses an algorithm for performing the claimed functions.  *Function Media*, 708 F.3d at 1318.  CCE does not attempt to point to an algorithm in its brief, because there is none disclosed.  (Dkt. 131 at 14.)  The disclosed "terminal" does not meet the requirements for definiteness without such an algorithm.

### (c)    Knowledge of One of Ordinary Skill in the Art Cannot Supplant the Absence of Structure

CCE also relies on the knowledge of one of ordinary skill in the art to argue that the '872 patent does not need to disclose an algorithm.  (Dkt. 131 at 15, 18, 20.)  Knowledge of one of ordinary skill in the art, however, cannot supplant a lack of disclosure in the specification.  *Aristocrat*, 521 F.3d at 1337 ("It is not enough for the patentee simply to state or later argue that persons of ordinary skill in the art would know what structures to use to accomplish the claimed function.").  To determine indefiniteness of a means-plus-function term, the inquiry "asks first whether structure is described in [the] specification."  *Default Proof*, 412 F.3d at 1301.  Here, there is no structure described in the specification for (i) receiving the network identifiers, (ii) comparing the network identifiers, or (iii) setting up the emergency call connection, in direct

contradiction of the requirement that "[t]here must be structure in the specification." *Biomedino*, 490 F.3d at 952. Because of the "total omission of structure," the requirements of the §112, ¶6 tradeoff cannot be satisfied. *Id*. at 948, 952 (affirming indefiniteness determination because of "no corresponding structure described in the specification").

CCE cites *Intel Corp. v. VIA Techs., Inc.*, but *Intel* still presumes the presence of *some* algorithmic structure in the specification. *See* 319 F.3d 1357, 1365-66 (Fed. Cir. 2003); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384-85 (Fed. Cir. 2011) (considering the adequacy of a "four-step" algorithmic structure disclosed in the specification). Once *some* structure is disclosed, its sufficiency is analyzed in light of the understanding of one of ordinary skill in the art. *Intel*, 319 F.3d at 1365-66. The Federal Circuit in *Aristocrat* distinguished *Intel* from the facts at issue there because "there was no algorithm at all disclosed in the specification." *Aristocrat*, 521 F.3d at 1337. Such is the case here. Without any disclosure of an algorithm, "the skilled artisan's knowledge is irrelevant." *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623-24 (Fed. Cir. 2015). Similarly, CCE's reliance on *AllVoice Computing PLC v. Nuance Communications, Inc.* is also problematic, because the protocols referenced in *AllVoice* explained *exactly how to effectuate* the claimed function. 504 F.3d 1236, 1241-42 (Fed. Cir. 2007). The '872 specification contains no such disclosure or structure, so the inquiry ends there. *See Aristocrat*, 521 F.3d at 1337 (holding that the knowledge of a person of ordinary skill in the art is only relevant if *some* structure is identified in the specification).

With the '872 specification coming up short by failing to provide any disclosure of the structure for performing the claimed functions, "one of ordinary skill in the art cannot supplant the total absence of structure from the specification." *Default Proof*, 412 F.3d at 1302. CCE cannot rely on what one of ordinary skill in the art would or would not know to "fill in the gaps" for a link that simply is not there. *Function Media*, 708 F.3d at 1319 (patentee "cannot rely on the knowledge of one skilled in the art to fill in the gaps" after "fail[ing] to provide any disclosure of the structure"); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1332 (Fed. Cir.

13

2003) ("Omega submits its expert declarations . . . to rewrite the patent's specification and explicitly provide for the laser splitting device, lenses, and prisms to strike the center of the energy zone.  That we cannot accept.").

The patentees could have written claim 12 by identifying a structure, without using means-plus-function language.  Alternatively, they could have included corresponding structure to the means-plus-function language in the specification.  But they did not.  The failure to abide by the "quid pro quo" requiring the specification to disclose the corresponding structure requires finding claim 12 indefinite and invalid.  *Default Proof*, 412 F.3d at 1298.

## 2. Additional '872 Patent Terms Invoke §112, ¶6 Under *Williamson*

Each of the following '872 patent claim limitations are means-plus-function limitations under *Williamson* that are also indefinite for failure to disclose sufficient structure.

| Term | CCE's Proposed Construction | Defendants' Proposed Construction |
|------|------|------|
| "receiver" (claim 13, 18) | No construction necessary. Not subject to 35 U.S.C. §112, ¶6. | Indefinite. This is a means-plus-function element to be construed in accordance with 35 U.S.C. §112, ¶6. Function:  receive a network identifier of a visited network notified to a terminal when the terminal is registered in the visited network Structure:  no corresponding structure disclosed |
| "comparator" (claim 13, 14) | No construction necessary. Not subject to 35 U.S.C. §112, ¶6. | Indefinite. This is a means-plus-function element to be construed in accordance with 35 U.S.C. §112, ¶6. Function:  compare the received network identifier of the visited network with a network identifier of a home network of the terminal Structure:  no corresponding structure disclosed |
| "connection unit" | No construction necessary. Not subject to 35 U.S.C. | Indefinite. This is a means-plus-function element to be |

| | | |
|---|---|---|
| (claim 13, 14) | §112, ¶6. | construed in accordance with 35 U.S.C. §112, ¶6.<br><br>Function:  set up an emergency call connection<br><br>Structure:  no corresponding structure disclosed |

These terms correspond exactly with the means-plus-function terms of claim 12. "Receiver" (claim 13) corresponds with "receiving means" (claim 12). "Comparator" (claim 13) corresponds with "comparison means" (claim 12). "Connection unit" corresponds with "connection means" (claim 12). These terms provide no structure beyond the function. They invoke §112, ¶ 6 and are invalid for failure to disclose sufficient structure.

### (a) "Receiver," "Comparator," and "Connection Unit" Invoke §112, ¶6

The "receiver," "comparator," and "connection unit" limitations are all means-plus-function limitations under the Federal Circuit's new standard for invoking §112, ¶6. There is no longer a "strong" presumption that §112, ¶ 6 does not apply in the absence of "means." *Williamson*, 792 F.3d at 1349. "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure." *Id.*

Here, those of ordinary skill in the art would not understand the terms "receiver," "comparator," or "connection unit" to be sufficiently definite structure. (Ex. 1 [Kenney Decl.] ¶¶ 61-63.) Other than removing the word "means," these terms add nothing more to the claims than the language in claim 12, which CCE ***admits*** are means-plus-function terms. (Dkt. 131 at 12, 16, 19.) Moreover, the claim language is directed to the functional capabilities of the receiver, comparator, and connection unit—"receive a network identifier of a visited network notified to a terminal when the terminal is registered in the visited network," "compare the received network identifier of the visited network with a network identifier of a home network of the terminal," and "set up an emergency call connection" respectively. Of course, something called a "receiver" will "receive," something called a "comparator" will "compare," and something

15

called a "connection unit" will "connect."  These are nothing more than "nonce" terms coined to invoke the functions they are to perform in the claim.  *See Williamson*, 792 F.3d at 1350.

In *Williamson*, the Federal Circuit found that a "distributed learning control module" was indefinite. 792 F.3d at 1354.  The Federal Circuit explained that "'[m]odule' is a **well-known nonce word** that can operate as a substitute for 'means' in the context of §112, ¶6."  *Id.* at 1350 (emphasis added).  The Federal Circuit recognized that "module" by itself "does not provide any indication of structure," nor does adding the prefix "distributed learning control" result in a "sufficiently definite structure."  *Id.* at 1350-51.  Like "module," other "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke §112, ¶6."  *Id.* at 1350 (quoting *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006)).  Moreover, in an earlier *Williamson* ruling, even before the decision that changed the standard, the Federal Circuit also found that the MPEP includes "unit for" in a list of "nonstructural generic placeholders" that may invoke §112, ¶6.  *See Williamson v. Citrix Online, LLC*, 770 F.3d 1371, 1382 (Fed. Cir. 2014).

Like the terms "module," "mechanism," and "device," these disputed terms in the '872 patent are generic "nonce" terms that fail to recite sufficiently definite structure.  *See Williamson*, 792 F.3d at 1350.  In fact, this Court already found the term "unit" does not recite sufficiently definite structure.  *See* Case No. 6:13-cv-507, Dkt. 363 at 30-31 (finding "designating unit" to invoke §112, ¶6.)  The claimed "receiver," "comparator," and "connection unit" in claim 13 are mere substitutes for the claimed "receiving means," "comparison means," and "connection means" recited in claim 12—terms that CCE already admits are means-plus-function limitations governed by §112, ¶6.[6]  (Dkt. 131 at 12, 16, 19.)  These terms are "not recognized as the name of

---

[6]  The Federal Circuit in *Williamson* recognized that in a prior unpublished decision, the court was presented with two closely related claim terms, a "settable control means," which indisputably invoked §112, ¶6, and a "settable control module."  *Williamson*, 792 F.3d at 1350 n.5.  The Federal Circuit found that "there was no difference in the structural implications of the

16

structure" and provide no information as to what structure or class of structures is contemplated." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004). These terms could correspond to countless generic elements in a communications system so long as the elements are configured to "receive a network identifier," "compare the received network identifier," and "set up an emergency call connection," respectively. The specification similarly contains no description or discussion of "receiver," "comparator," or "connection unit" outside of the claims.

Accordingly, these terms are directed to "function without reciting sufficient structure for performing that function" and fail to "recite sufficiently definite structure" and, as such, should be treated as mean-plus-function terms under the standard set forth in *Williamson*.

### (b)   "Receiver," "Comparator," and "Connection Unit" Are Indefinite

As discussed above with respect to the corresponding means-plus-function terms of claim 12, the '872 specification fails to describe or even mention the terms "receiver," "comparator," and "connection unit" outside of the claims; at best, the specification describes some undisclosed structure within a generic "terminal." For the same reasons set forth above for why the means-plus-function terms of claim 13 are indefinite, the "receiver," "comparator," and "connection unit" are also indefinite, because the '872 patent fails to clearly link or associate any structure or class of structures to these claim terms or their functions.

### B.   U.S. Patent No. 8,645,786

The '786 patent generally relates to coding and decoding techniques between a terminal and a base station in a mobile telecommunications network. "Coding" in this context involves two principal phases. First, parity bits are added to a packet of data to improve transmission

---

terms" and "held that the presumption against means-plus-function claiming was rebutted and the 'settable control module' was properly construed as a mean-plus-function term." *Id*.

reliability. Second, bits are punctured (deleted) or repeated in order to achieve a desired number of bits for a given transmission frame size. This second phase is known as "rate matching."

The terminal transmits packets using "incremental redundancy," meaning that if the base station does not receive a transmitted packet correctly, a differently-encoded packet can be sent to improve decodability. These differently-encoded back-up packets are known as "redundancy versions." At a high level, the '786 patent concerns methods for selecting a redundancy version when the previously-transmitted redundancy version is received incorrectly.

### 1. "self-decodable"

| Term | CCE's Proposed Construction | Defendants' Proposed Construction |
|------|------------------------------|-----------------------------------|
| "self-decodable" (claims 1, 12) | No construction necessary. | "decodable only by itself without considering other data" |

The '786 specification expressly defines the term "self-decodable," and that express definition governs. *See, e.g.*, *Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1138 (Fed. Cir. 2007)("We have frequently found that a definition set forth in the specification governs the meaning of the claims"); *Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002)("Where, as here, the patentee has clearly defined a claim term, that definition usually is dispositive; it is the single best guide to the meaning of a disputed term." (citation omitted)).

In the context of describing a redundancy version ("RV"), the specification states that "self-decodable . . . *means* decodable only by itself." ('786 patent at 2:59-60) (emphasis added). *C.f. Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009)(holding that a specification statement regarding what a term "means" constituted an explicit definition). Defendants' construction captures this lexicography by including the language "decodable only by itself," which comes directly from the patentees' unambiguous definition. CCE argues that Defendants' construction of "decodable only by itself" is a "reshuffl[ing]" of the claim term. (Dkt. 131 at 9.) However, this is precisely how the patentees chose to define it.

The specification also provides further clarity as to why "without considering other data" is a necessary component of the construction:

> The parameter s specifies whether the RV [(redundancy version)] is self decodable, ***this means decodable if only this RV is considered***. Decodable means in this respect, that the information content of the data packet, represented by the redundancy version can be found out. ***If s=1***, then when puncturing during rate matching the so called systematic bits are prioritized over the parity bits of the turbo code. Such a redundancy version is typically self decodable, ***that means, that it can be decoded by itself***, unless of course the reception is too noisy. ***This is not the case when s=0*** (parity bits are prioritized), ***where it can happen that a RV cannot be decoded by itself***, even in the absence of noise, ***but only together with an other [sic] RV***.

('786 patent at 8:39-50 (emphasis added).)   This passage contains additional definitional language specifying what the term self-decodable "means."  Indeed, CCE also concedes that the above passage "makes clear" the meaning of the term "self-decodable."  (Dkt. 131 at 8.) Specifically, this passage makes clear that in order for an RV to be "self decodable," it must be decodable without considering any other RVs. Thus, "without considering other data" captures the definition set forth in the paragraph cited above.

CCE's arguments that Defendants' construction is vague are unpersuasive and internally inconsistent.  CCE objects that "data" is overly broad, arguing that it would preclude considering all information, including the information "inherently necessary" to perform decoding.  (Dkt. 131 at 9.)  On the other hand, CCE calls Defendants' construction "unduly narrow."  (*Id.* at 10.) CCE's artificial distinction between "information" and "data" is irrelevant and mischaracterizes the issue.  Rather, the important point is that self decodable data is decodable by itself—it does not need to resort to ***other*** data (or information) to be decoded.

Despite the explicit definition provided in the specification, CCE argues that this term has a "plain meaning."  (*Id.* at 8.)  Yet, CCE offers no support for why a lay jury member would understand this highly-technical term used in the context of a wireless communications scheme. Moreover, there is no "widely accepted meaning" that would be "readily apparent to lay judges." *Phillips*, 415 F.3d at 1315.  And even if there were, the patentee's lexicography "governs."  *Id.* at

1316; *c.f. Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009)(holding that "the specification defines 'malleable' . . . and that definition overrides any ordinary meaning of the word 'malleable'").

Finally, CCE's argument that "self decodable" should not be construed by itself, but rather in conjunction with the larger phrases "self-decodable redundancy version" and "self decodable rate matching pattern" is contradicted by CCE's proposed constructions.  Both of CCE's proposed constructions break up "self decodable" from the rest of the phrase.  Furthermore, in both instances, CCE  construes only the latter portion of the phrase, not "self decodable."  For all these reasons, the Court should adopt Defendants' construction.

## 2.    "self-decodable redundancy version"

| Term | CCE's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "self-decodable redundancy version" (claims 1, 12) | "redundancy version":  "One of multiple possible encoded representation of a bit sequence suited for transmission and/or retransmission"  "self-decodable":  no consideration necessary | "one of multiple possible encoded representations of a bit sequence decodable only by itself without considering other data and suited for transmission/retransmission to ensure correct receipt. |

The parties dispute the meaning of the "self-decodable" portion of "self-decodable redundancy version," for the same reasons as discussed in the previous section.  With respect to the "redundancy version" portion of this phrase, the parties dispute whether the "redundancy version" must be "to ensure correct receipt."

The express claim language supports Defendants' construction.  claim 1 requires, among other things, (1) "initially transmitting" a "redundancy version," (2) "retransmitting" the data using a "second redundancy version" upon "receiving a confirmation confirming an incorrect receipt," and (3) "retransmitting" the data using a "third redundancy version" upon "receipt of a further confirmation confirming an incorrect receipt."  ('786 patent at 16:59-17:7.)  In other words, the claim limitations require retransmissions in response to an earlier incorrect receipt of

the encoded data.  Thus, the use of redundancy versions ensures correct receipt of the encoded data, whether in an initial transmission or via subsequent retransmissions.

The '786 patent specification provides further support for Defendants' construction.  It explains that "[t]he base station acknowledges the correct or incorrect receipt" of a transmission, and "[i]n case of a NACK [*i.e.*, incorrect receipt], the terminal UE retransmits the data packet." ('786 patent at 3:49-50.)  When packets are retransmitted, "differently encoded packets are sent, known e.g. as different redundancy versions."  (*Id.* 6:36-37.)  Such redundancy versions "influence[] the effectiveness of a combined decoding of a data packet as transmitted originally taken together with a retransmission."  (*Id.* 7:30-32.)  The retransmissions using different redundancy versions improve the ability of the base station to decode the message, helping to ensure correct receipt.

CCE mischaracterizes Defendants' construction as requiring correct receipt in all circumstances.  (Dkt. 131 at 10-11.)  In light of the express claim language that clarifies that transmissions still may not be correctly received, Defendants' construction uses the infinitive "to ensure" to express an important characteristic of redundancy version selection, rather than a requirement in all circumstances.  Thus, Defendants' construction should be adopted.

### 3.    "self-decodable rate matching patterns"

| Term | CCE's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "self-decodable rate matching patterns" (claims 1, 12) | "rate matching patterns": "patterns for puncturing and/or repeating bits"<br><br>"self-decodable":  no construction necessary | Indefinite |

Claim 1 requires "a first rate matching pattern selected from a set of at least two *self decodable rate matching patterns*." '786 patent at 16:52-54 (disputed term emphasized).  A person of ordinary skill in the art would not understand the term "self decodable rate matching pattern" with reasonable certainty.  (Ex. 1 [Kenney Decl.] at ¶ 66.).  Therefore, this term is

indefinite.  *Nautilus,* 134 S.Ct. at 2124 ("[A] patent is invalid for indefiniteness if it[] . . . fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.").

      **(a)**      **"Self Decodable Rate Matching Pattern" Is A Nonsensical Term And The Intrinsic Evidence Renders Its Scope Unclear.**

The term "self decodable rate matching pattern" is not used outside of the '786 patent and related applications.  (*See* Ex. 1 [Kenney Decl.] at ¶ 70.)  While patentees may act as their own lexicographers, the term is not explained in the '786 patent.  This term was injected during prosecution to overcome a different §112 rejection.  (*See* '786 patent (May 9, 2011 Office Action Resp. at 7).)  Nothing in the prosecution history sheds light on its meaning, either, rendering the claim indefinite.  *C.f. Acacia Media Techs. Corp. v. New Destiny Internet Group*, 2004 U.S. Dist. LEXIS 13415, at *60 (C.D. Cal. July 12, 2004)("The term 'sequence encoder' never appears in the specification of the '702 patent.  The legal consequence of claiming an apparatus which has no plain meaning and which is not defined or referred to in the specification is for the Court to declare the patent claim indefinite."), *later proceeding at*, 405 F. Supp. 2d 1127, 1134 (N.D. Cal. 2005)(finding indefiniteness of independent claims on this basis, holding "[i]f a patentee uses a coined technical term as an element of a claim and fails to clearly define the term elsewhere in the specification or prosecution history, the meaning of the term is left to speculation and subjective judgment.  A patent claim, which includes [such a term], is indefinite.").

While the '786 patent defines the sub-phrases "self decodable" and "rate matching pattern" in isolation, these sub-phrases have no meaning when combined.  As discussed above, "self decodable" refers to whether something can be decoded by itself without considering other data, and is used exclusively by the '786 patent to refer to a type of redundancy version (the end product of the coding process).   "Rate matching pattern" refers to the pattern for puncturing (deleting) or repeating bits during rate matching stage of the coding process.  ('786 patent at 9:32-39).  Unlike redundancy versions, rate matching patterns are never decoded—neither in the '786 patent nor in the art.  (*See* Ex. 1 [Kenney Decl.] at ¶ 71.)  Thus, while a "self decodable redundancy version" makes sense as a "redundancy version" that is "self-decodable," "self

decodable rate matching pattern" cannot be understood to use the adjective "self decodable" in the same manner (or any other manner).  Yet, the claims cannot be understood to use the same term, "self decodable," in two different ways.  "[W]here as here, claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated."  *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).  The court may not redraft the claims to sustain their validity.  *Id.*

The '786 patent also teaches away from rate matching patterns being "self decodable." The specification discloses two parameters, *s* and *r*, which are used to select a redundancy version.  The parameter *r* determines the "rate matching pattern" used to create the redundancy version.  (*See* Ex. 3, Sept. 19, 2013 Office Action Resp. (explaining that the "rate matching pattern . . . *is based on the rate matching parameter* **r** of Table 1") (emphasis added); *see also* '786 patent at 8:21-38 (disclosing the use of parameter *r* in relation to deriving the rate matching pattern).)  The parameter *s* determines whether the redundancy version is "self decodable."  (*See* '786 patent at 8:21–52.)  These parameters operate independently of each other such that the selection of a rate matching pattern (parameter *r*) does not affect whether the redundancy version is self decodable (parameter *s*).  (Ex. 1 [Kenney Decl.] at ¶ 73.)  Because these are separate processes, the intrinsic evidence teaches away from the concept of a "self decodable rate matching pattern."  "It is clear that a claim can be found invalid for indefiniteness when the claims teach something inconsistent with the specification."  *Disa Indus. A/S v. Thyssenkrupp Waupaca, Inc.*, Case No. 07-C-949, 2009 U.S. Dist. LEXIS 29873, at *12 (E.D. Wis. Apr. 7, 2009)(*citing Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F. Supp.2d 423, 564 (S.D.N.Y. 2002); *Ex Parte Craig S. Gittleman*, 2008 WL 696137, at *4 (Bd. Pat. App. & Interf. 2009); *Application of Cohn*, 438 F.2d 989, 993, 58 C.C.P.A. 996 (Ct. Cust. & Pat. App. 1971)).

Therefore, the notion of a "self decodable rate matching pattern" is both nonsensical and contradicted by the disclosure of the '786 patent.  This shrouds the asserted claims with a zone of uncertainty, such that the public is not put on notice of what is within their scope.  (Ex. 1 [Kenney Decl.] at ¶ 75.)  For the aforementioned reasons, this term is indefinite.  (*Id.*)

### (b)   CCE's Multiple Constructions Further Demonstrate This Term's Indefiniteness.

CCE has now offered three different interpretations[7] of "self decodable rate matching patterns," each of which is shown in the table below:

| CCE's different interpretations of "self decodable rate matching patterns" | | |
|---|---|---|
| **CCE's P.R. 4-2 Disclosure** | **CCE's P.R. 4-3 Statement** | **CCE's Resp. Letter Br.** |
| "rate matching patterns that prioritize systematic bits" | "self decodable": no construction necessary<br><br>"rate matching patterns": "patterns for puncturing and/or repeating bits" | "a rate matching pattern that *produces* self-decodable information" (Dkt. 121-1 at 3.) |

In its P.R. 4-2 disclosure and 4-3 statement, CCE construed "self-decodable" and "rate matching pattern" separately.  The indefiniteness problem, however, lies not in determining the meaning of those two sub-terms but in the meaning of ***the entire phrase***.  Simply gluing the two definitions together does not make sense because a rate matching pattern cannot literally be self decodable.  Thus, neither of CCE's first two stabs at the issue resolves the problem.

In CCE's responsive letter brief,[8] CCE now appears to agree that "self decodable" is not a literal characteristic of a rate matching pattern, and that it is "not literally possible" to decode a rate matching pattern.  Dkt. 121-1 at 2.  CCE agrees further that it would be improper to "divorce" these sub-phrases—that they can only be understood as a "compound phrase."  *Id*. Defendants agree that this is not a situation in which the definitions of sub-terms can be meaningfully combined.  *See Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1360 (Fed. Cir. 2005) (holding that merely combining definitions of sub-terms was not a tenable theory in light of the specification).  Thus, the constructions that CCE proposed in its 4-3

---

[7] CCE's repeated modifications to its construction of this term further illustrate the difficulties that one of ordinary skill in the art would face in trying to interpret this term.

[8] Despite offering a construction for this term, CCE did not address the term in its opening claim construction brief.

statement (and earlier 4-2 disclosure)—which break up the larger phrase—should be rejected.

The new interpretation that CCE advanced in its responsive letter brief—which attempts to interpret the entire phrase (*see* Dkt. 121-1 at 2 (suggesting that this term means "a rate matching pattern that *produces* self decodable information"))—should also be rejected.  As explained above, the rate matching pattern does not determine whether the produced redundancy version is self-decodable.  Rather, it affects the repeating or puncturing of bits during the creation of a redundancy version, which may or may not be self-decodable for other reasons.  CCE's newest interpretation improperly injects a "produc[tion]" function into this term, which improperly requires the rate matching pattern to affect self-decodability.  As there is no way for a person of ordinary skill in the art to understand the larger phrase, which CCE agrees is the proper term to be construed here, the term is indefinite.

### C.      U.S. Patent No. 8,055,820

The '820 patent relates to a system and method for purportedly increasing buffer status reporting efficiency and adapting buffer status reporting according to uplink capacity.  (Dkt. 1-3 ['820 patent] at Abstract.)  To convey its needs for resources to the network, a user device can report a data buffer status report.  (*Id*. at 8:66-9:5.)  The '820 patent discloses two distinct types of buffer status reports—a long format and a short format.  (*Id*. at 1:53-55.)  In certain embodiments, a designating unit designates which format should be used.  (*Id*. at 1:60-2:2.)

### 1.      "monitor[ing] a usage of a plurality of buffers"

| Term | CCE's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "monitor[ing] a usage of a plurality of buffers" (claims 1, 12, 24) | No construction necessary. *See* June 1, 2015 Memorandum Opinion and Order, Case No. 6:13-cv-507 (Dkt. 413) | "monitoring an act, way, or manner of using a plurality of buffers." |

Defendants' propose construing "monitor[ing] a usage of a plurality of buffers" in claims 1, 12, and 24 to be "monitoring an act, way, or manner of using a plurality of buffers."  While the term "usage" was previously construed by this Court in an earlier case, the term

"monitor[ing] a usage of a plurality of buffers" deserves a second look in light of clear language in the specification.[9, 10]   Defendants believe that the prior finding of "no construction necessary" for "usage" does not resolve the parties' dispute as to the scope of the claim limitation, rendering the term "usage" in the phrase "monitoring a usage of a plurality of buffers" superfluous.  *O2 Micro Int'l. Ltd. v. Beyond Innovation Tech. Co., et al.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (holding that when "the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it").   Therefore, Defendants respectfully request that this Court consider Defendants' arguments here in support of its construction for the term "monitor[ing] a usage of a plurality of buffers."

CCE criticizes the Defendants' construction as seeking a "confined construction of 'usage' that deprives the claim of the full scope of its ordinary meaning." (Dkt. 131 at 5.)  But in fact, it is CCE's proposed construction (or lack thereof) that is divorced from the scope of the claim language's ordinary meaning by equating monitoring buffers with "monitoring a usage of a plurality of buffers."

CCE's argument that "monitoring 'usage' is a precursor to detecting a preselected condition," and therefore "comports with a broad"—yet  undefined—"understanding of usage" is misplaced. (Dkt. 131 at 6.)  The portions of the specification to which CCE cites simply show, as discussed in more detail below, that (i) in some embodiments, there is a monitoring of buffers, or in a more narrow example, "monitoring a usage of [a] plurality of buffers," and (ii) in various embodiments, there are different ways in which "detecting a pre-selected condition" takes place, such as by detecting "that the data in communication buffers has exceeded a pre-determine threshold." (*See, e.g.,* '820 patent at 6:1-2, 7:58-63).

However, CCE provides no explanation for the portions of the specification that

---

[9]   Samsung was not a party to the prior litigation in which this term was construed, and therefore is not subject to collateral estoppel.

[10]   The Defendants that are also defendants in the earlier CCE cases, *i.e.*, Case No. 6:13-cv-507 (E.D. Tex.) (AT&T, Verizon, T-Mobile, and Sprint) understand that the Court has ruled on the construction of "usage" in those cases.  Those Defendants join Samsung's arguments here, at a minimum to preserve their rights for appeal.

explicitly differentiate the broader step of "monitoring buffers" from the narrower "monitoring a usage of a plurality of buffers," (*see* '820 patent at 7:51-52, 58-60; 8:7-9), other than to baldy assert the two terms are "congru[ous]."   (Dkt. 131 at 7.)   Thus, CCE's interpretation eliminates any distinction between the different language, despite the specification showing otherwise. (*See* '820 Patent at 7:51-52, 58-60; 8:7-9.)  *See Cephalon, Inc. v. Abraxis Bioscience, LLC*, 2015 WL 3756870, at *3 (Fed. Cir. June 17, 2015) (citing *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) and *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004)).  As a result, the parties' dispute over whether "monitoring buffers" is the same as "monitoring a usage of a plurality of buffers" must be resolved before this case is sent to a jury.

Defendants' construction, on the other hand, makes explicit the distinction described in the specification.  The '820 patent specification clarifies that the claimed "monitoring a usage of a plurality of buffers" is narrower in scope than merely "monitoring buffers." (*See* '820 patent at 7:58-60 ("In certain embodiments, monitoring 310 buffers *may include* monitoring a usage of one or more communications buffers.") (emphasis added).)  The specification makes clear that "monitoring a usage of one or more communications buffers" is *just one type* of monitoring buffers.  Any interpretation that may permit monitoring a usage of buffers to include merely monitoring the buffers is inconsistent with the distinction the patentee choose to set forth in the specification and eviscerates the meaning of the word "usage" from the claim scope.

Defendants' construction is consistent with how other courts have interpreted the phrase "may include" in a specification for claim construction purposes.  For example, in *TDM Am., LLC v. United States*, the United States Court of Federal Claims analyzed two patents that had the same "may include" language found in the '820 patent.  85 Fed. Cl. 774 (2009).  The court differentiated a sentence using "may include" from a sentence that merely used "includes."  *Id.* at 799.  It determined that the claimed device had to include the feature that followed "includes," whereas with "may include," the feature that followed *was just one of possibly many different embodiments*.  *Id.*  With respect to a second patent, the term "dredged materials" was followed

27

by "may typically include" and a list of different materials, including "other materials in addition to sediment that is removed from the subaqueous location such as waterway." *Id*. at 800.  The court again focused on the "may include" language and determined that "dredged materials" should be read broadly and not be limited to materials from subaqueous sources. *Id*. at 800-01.

Similar to the language at issue in *TDM*, here the phrase "monitoring buffers" should also be read broadly and not limited to just a disclosed embodiment of "monitoring a usage of buffers," where the patentee chose to include the phrase "may include" when describing different embodiments involving "monitoring buffers."  (*See* '820 patent at 7:58-60.)  Thus, Defendants are not trying to narrow a claim limitation in light of the specification, as CCE contends.  Rather, Defendants' construction ascribes meaning to the disputed term as the patentee used that term in the patent.  The patentee explicitly chose to claim "monitoring *a usage of* buffer," as opposed to the broader "monitoring buffers," and should not now, in the midst of litigation, be permitted to broaden what it claimed years ago.  Defendants' construction reconciles the distinction between monitoring buffers and monitoring the usage of buffers—the former monitors the buffers themselves while the latter, for example, monitors how the buffers are being used.  (*See* Exs. 4 and 5 (depicting the numerous dictionary definitions that are consistent with Defendants' construction).)   Therefore, Defendants' construction is the proper meaning of the term "monitor[ing] a usage of a plurality of buffers."

### 2.    "network device"

| Term | CCE's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "network device" (claims 1, 12, 24) | No construction necessary.  Not subject to 35 U.S.C. 112(6)  Alternatively, "base station." | Indefinite.  This is a means-plus-function element to be construed in accordance with 35 U.S.C. §112, ¶6.  Function:  receiving the communicated buffer status report  Structure:  no corresponding structure disclosed |

The "network device" in the '820 patent is a means-plus-function limitation that is indefinite for failure to disclose sufficient structure for performing the claimed functionality.

### (a)    "network device" is a means-plus-function limitation

The claimed "network device" is a means-plus-function limitation under the Federal Circuit's new standard under *Williamson* for invoking §112, ¶6.  Just like the '872 terms above, those of ordinary skill would not understand the term "device" to be sufficiently definite structure, even when paired with the term "network."  (Ex. 1 [Kenney Decl.] ¶¶ 82-85.)  The claim language itself is directed to nothing more than the functional capabilities of the device (*e.g.*, receiving the communicated buffer status report), not to any particular structure that implements that function.

Just as the Federal Circuit in *Williamson* found the term "module" to be a well-known nonce word that can operate as a substitute for "means" in the context of §112, ¶6, the Federal Circuit found that the term "device" fit into the category of generic nonce words that "reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke §112, ¶6."  *Williamson*, 792 F.3d at 1350.  The Federal Circuit recognized that these nonce terms by themselves "[do] not provide any indication of structure" and nor does adding prefixes, such as "distributing learning control" result in a "sufficiently definite structure."  *Id*. at 1351.  Such is the case here, where the term at issue is directed to the nonce word "device," and the prefix "network" does not provide any sufficiently definite structure to implement the functions of the claim.  (*See* Kenney Decl. ¶¶ 83-84.)  Indeed, a "network" device can apply to any device that works on any network.  (*See id.* at ¶ 84.)

Moreover, like in *Williamson*, the '820 patent specification only refers to the modules in terms of the claimed functionality, and never in terms of any structural detail.  Tellingly, even the figures (such as the excerpt from Fig. 1, right) illustrate the device as nothing more than a structurally nondescript black box:

Accordingly, the "network device" is directed to "function without reciting sufficient structure for performing that function" and fails to "recite sufficiently definite structure" and, as such, should be treated as means-plus-function terms under the standard set forth in *Williamson*.

### (b)  "network device" is indefinite

Since the "network device" is a means-plus-function limitation, the patent specification "must disclose adequate corresponding structure to perform all of the claimed functions." *Williamson*, 792 F.3d at 1351-52.  Looking to the '820 specification, however, one of ordinary skill would be hard-pressed to find any disclosure of structure corresponding to the claimed "network device."  (*See* Kenney Decl. ¶ 85.)  Indeed, the '820 specification describes the claimed "network device" consistently and exclusively with respect to its functional capabilities, but never in terms of any particular structure for implementing those functions.  (*See id.*; *see, e.g.*, '820 patent at 5:40-42 ("In certain embodiments, the network device 120 is configured to receive buffer status reports from the user equipment 110.").)

Other than the black box labeled "network device" in Figure 1, there is simply no disclosure of any structural component (*e.g.*, circuitry, electrical components, or otherwise) anywhere in the '820 patent.  (Kenney Decl. ¶ 85.)  And one of ordinary skill in the art would not understand the term "network device" to be sufficiently definite structure on its own.  (*Id.* at ¶83.)  Since the '820 patent fails to disclose adequate corresponding structure to perform all of the claimed functionalities of the claimed "network device," claims 1, 12, 24 of the '820 patent are indefinite.  *Default Proof Credit Card Sys.*, 412 F.3d at 1298.

### D.    U.S. Patent No. 7,218,923

The '8923 patent relates to a system and method for controlling the behavior of messages sent by applications within a terminal.  (Dkt. 76-2 ['8923 patent] at Abstract.)  The emergence of open development platforms ushered in new services and applications for the multimedia environment.  (*See id.* at 1:31-37.)  However, open development platforms enabled fraudulent applications to misuse the communication environment.  (*See id*. at 1:38-47.)  The '8923 patent sought to allegedly eliminate this issue by "ascertaining [whether] the applications developed for

the open platform behave in an appropriate and rightful manner." (*Id.* at 1:39–43.)

The alleged invention includes a diverting unit that routes some of an application's outgoing messages to a separate controlling entity before they are sent out to the network. (*See id.* at 10:62–65.) The diverting unit can be configured with parameters to purportedly accomplish a number of effects, including: checking the rights of the application program to send messages to the network, adding an additional identifier to the message, or adding a digital signature for authentication. (*See id.* at 1:67–2:3, 2:58–62.) The separate controlling entity houses the control mechanisms. (*See id.* at 1:59-60.) For example, the controlling entity can be configured with a set of predetermined parameters that determine whether the application that sent the outgoing message should behave in a certain manner. (*See id.* at 10:66–11:5.)

### 1.   "controlling entity"

| Term | CCE's Proposed Construction | Defendants' Proposed Construction |
|------|------------------------------|------------------------------------|
| "controlling entity" (claims 1, 4, 24, 26) | No construction necessary.  Not subject to 35 U.S.C. §112, ¶6. Alternatively, should the Court determine this term is subject to 35 U.S.C. 112(6): Function:  controlling, based on the message and before the message is transmitted to the communication network, whether the application program behaves in a predetermined manner in the communication terminal. Structure:  trusted entity/agent 212 (and equivalents).  See, e.g., 1:59-2:67, 3:57-66, 4:46-54, 4:20-42, 6:27-48, 6:49-67, 7:13-8:19, 4:63-5:5 and in Figs 2-3 and 5-10. | Indefinite. This is a means-plus-function element to be construed in accordance with 35 U.S.C. §112, ¶6. Function:  "controlling . . . whether the application program behaves in a predetermined manner" Structure:  no corresponding structure disclosed |

The "controlling entity" limitation in the '8923 patent is a means-plus-function limitation that is indefinite for failure to disclose sufficient structure for performing the claimed functionality. (Kenney Decl. at ¶ 90.)

### (a)   "controlling entity" is a mean-plus-function limitation

"Controlling entity" is directed to the functional capabilities of the entity— "controlling . . . whether the application program behaves in a predetermined manner." ('8923 patent at cl. 1.)  The term "entity," just like "unit," "device," and other "nonce" terms described in *Williamson*, is simply "a generic description for software or hardware that performs a specified function" and therefore falls under the ambit of §112, ¶6.  *Williamson*, 792 F.3d at 1350.  The prefix "controlling" adds no more to the generic term "entity," because controlling simply refers to the claimed functionality and not the structural detail.

Moreover, like the patent at issue in *Williamson*, the '8923 patent specification only refers to the controlling entity as the "trusted agent 212" and its claimed functionality.  But the specification never provides any structural detail on the "trusted agent 212," and the figures illustrate that the entity is nothing more than a structurally nondescript black box:



('8923 patent at Fig. 2 (emphasis added).)  Accordingly, the "controlling entity" is directed to "function without reciting sufficient structure for performing that function" and fails to "recite sufficiently definite structure" and, as such, should be treated as means-plus-function terms under the standard set forth in *Williamson*.  (Kenney Decl. at ¶ 91.)

### (b)     "controlling entity" is indefinite

Since the "controlling entity" is a means-plus-function limitation, the patent specification "must disclose adequate corresponding structure to perform all of the claimed functions."  *Williamson*, 792 F.3d at 1351-52.  Looking to the '8923 specification, however, one of ordinary skill could not find any disclosure of structure corresponding to the claimed "controlling entity."

(*See* Kenney Decl. at ¶ 92.)  The only description of the "controlling entity" in the specification is "trusted agent 212," which takes the form of a nondescript "black box" in Figure 2, as illustrated above.  (*Id.*)  Such a "black box" recitation of structure," however, is insufficient to meet the strictures of §112, ¶6.  *See Williamson*, 792 F.3d at 1350-51.

CCE admits that the "trusted agent 212" is a "software entity," and points to Figures 2, 3, 5-8 as allegedly describing details of this software entity.  (Dkt. 121-1 at 4.)  However, computer-implemented means-plus-function limitations, "must disclose an algorithm for performing the claimed-function," in order to meet the definiteness requirements of 35 U.S.C. §112, ¶2.  *Augme Techs.*, 755 F.3d at 1337.  None of the '8923 figures provide details of *how* the trusted agent is structured or any specific algorithm for performing its claimed function.  The figures merely illustrate the trusted agent as a structurally nondescript black box.  Figs. 3 and 5 state only that the trusted entity 212 performs a "check of rights" of an application, and then performs the "message control," without providing any specific algorithms for the claimed function of "controlling whether the application program behaves in a predetermined manner in the communication terminal."  ('8923 patent at Figs. 2, 3, 5-8).  The corresponding descriptions of these figures, also fail to set forth any structural details for the claimed "controlling entity."  Therefore, claims 1, 4, 24, and 26 are indefinite and thus invalid.  (Kenney Decl. at ¶ 90.)

## V.   CONCLUSION

For the §112, ¶6 terms, the claim language and specifications point to the same conclusion—the patentee claimed software functions without disclosing algorithms clearly linked to performing those functions and failed to inform one skilled in the art of the scope of the inventions.  Defendants' constructions for the remaining terms, which are faithful to the claim language and consistent with the specification and prosecution history, should also be adopted.

DATED:  November 6, 2015

Respectfully submitted,

/s/ Michael E. Jones
Michael E. Jones
State Bar No. 10929400
Patrick C. Clutter, IV
State Bar No. 24036374
mikejones@potterminton.com
patrickclutter@potterminton.com
Potter Minton, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

Charles B. Molster, III
Virginia State Bar No. 23613
Thomas M. Dunham
D.C. Bar No. 448407
Corrine M. Saylor
D.C. Bar No. 997638 (Pro Hac Vice)
cmolster@winston.com
tdunham@winston.com
csaylor@winston.com
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Tel: (202) 282-5000
Fax: (202) 282-5100

Sarah J. Kalemeris
IL Bar No. 6303644
skalemeris@winston.com
WINSTON & STRAWN LLP
35 W Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700

**ATTORNEYS FOR CELLCO
PARTNERSHIP D/B/A/ VERIZON
WIRELESS**

/s/ Michael E. Jones
Kevin Johnson
kevinjohnson@quinnemanuel.com
Victoria Maroulis
victoriamaroulis@quinnemanuel.com
Ray Zado
rayzado@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
Tel: 650-801-5000
Fax: 650-801-5100

Marissa Ducca
Deepa Acharya
marissaducca@quinnemanuel.com
deepaacharya@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN LLP
777 6th Street NW, 11th Floor
Washington, D.C. 20009
Tel: 202-538-8109
Fax: 202-538-8100

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Allen F. Gardner
State Bar No. 24043679
allengardner@potterminton.com
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

**ATTORNEYS FOR SAMSUNG
ELECTRONICS CO., LTD. AND
SAMSUNG ELECTRONICS AMERICA,
INC.**

*/s/ Caroline A. Bader*
Mark McGrory (*pro hac vice*)
Megan J. Redmond (*pro hac vice*)
Carrie A. Bader (*pro hac vice*)
ERISE IP
6201 College Boulevard, Suite 300
Overland Park, KS 66211
Office: 913-777-5600
Fax: 913-777-5601
Mark.mcgrory@eriseip.com
Megan.redmond@eriseip.com
Carrie.bader@eriseip.com

Robert W. Weber
Texas State Bar No. 21044800
SMITH WEBER, L.L.P.
5505 Plaza Drive
P.O. Box 6167
Texarkana, TX 75505-6167
Tele: (903) 223-5656
Fax: (903) 223-5652
Email: bweber@smithweber.com

Mark W. McGrory (*pro hac vice*)
Erise IP, P.A.
6201 College Blvd, Ste 300
Overland Park, KS  66211
(913) 777-5600
(913) 777-5601 - fax
mark.mcgrory@eriseip.com

**ATTORNEYS FOR SPRINT
SOLUTIONS, INC., SPRINT
SPECTRUM L.P., AND BOOST
MOBILE, LLC**

*/s/ Christopher W. Kennerly*
Christopher W. Kennerly
TX Bar No. 00795077
chriskennerly@paulhastings.com
Jonas P. Herrell
CA Bar No. 279075
jonasherrell@paulhastings.com
PAUL HASTINGS LLP
1117 S. California Ave.
Palo Alto, CA  94304-1106
Telephone: (650) 320-1800
Facsimile: (650) 320-1900

Jeffrey D. Comeau
CA Bar No. 259679
jeffreycomeau@paulhastings.com
PAUL HASTINGS LLP
4747 Executive Drive
Twelfth Floor
San Diego, CA 92121-3114
Telephone: (858) 458-3000
Facsimile: (858) 458-3005

Trey Yarbrough
TX Bar No. 22133500
trey@yw-lawfirm.com
YARBROUGH WILCOX, PLLC
100 E. Ferguson St., Suite 1015
Tyler, Texas 75702
Telephone (903) 595-3111
Facsimile (903) 595-019

**ATTORNEYS FOR AT&T MOBILITY
LLC**

*/s/ Melissa R. Smith*
Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, TX 75670
Phone: (903) 934-8450
Fax: (903) 934-9257
melissa@gillamsmithlaw.com

John C. Hueston
Alex C. D. Giza
Douglas J. Dixon
HUESTON HENNIGAN LLP
620 Newport Center Dr., Ste. 1300
Newport Beach, CA 92660
Phone: (949) 229-8640
JHueston@hueston.com
AGiza@hueston.com
DDixon@hueston.com

**ATTORNEYS FOR T-MOBILE USA,
INC. AND T-MOBILE US, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on the 6th day of November, 2015 per Local Rule CV-5(a)(3).

*/s/ Michael E. Jones*